**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

KRIS VAN DER LEEUW and LAURA
VAN DER LEEUW

    Plaintiffs,

vs.

VEOLIA WATER NEW JERSEY, INC.
and BOROUGH OF ALLENDALE,

    Defendants.

:  Civil Action No. 26-6852
:  (Newark Vicinage)
:
:
:
:
:
:  **COMPLAINT AND JURY DEMAND**
:
:
:
:

Plaintiffs Kris van der Leeuw and Laura van der Leeuw (hereinafter collectively "Plaintiffs") by way of their Complaint against Veolia Water New Jersey, Inc. (hereinafter "Veolia") and Borough of Allendale (hereinafter "Allendale") (collectively "Defendants") hereby state:

**SUBSTANCE OF THE ACTION**

1. This is an action arising from Defendants' secret industrialization of a water well located on Plaintiffs' residential property conducted in direct defiance of the express warnings of Defendants' own engineers in 1991 and 2020 and the subsequent sale of unlawfully acquired property rights as part of an $18 million sale without ever compensating or even notifying Plaintiffs.

2. Based on Defendants' unlawful taking of property rights belonging to Plaintiffs without just compensation and in violation of the United States Constitution and the New Jersey Constitution, Plaintiffs now bring their 42 U.S.C. § 1983 claim for monetary damages based on Defendants' prior physical takings, including diminution damages set forth in this Complaint and other damages for related compensable harm.  No injunctive relief is sought in this action.

## PARTIES

3.  Plaintiffs Kris van der Leeuw and Laura van der Leeuw are the owners of the property located at 7 Ethel Avenue in the Borough of Allendale, County of Bergen and State of New Jersey (hereinafter the "Property") having acquired title from Thomas and Theresa Bullen on or about August 29, 2019.

4.  Defendant Veolia Water New Jersey, Inc. ("Veolia") is a public water utility headquartered in 69 Devoe Place, Hackensack, NJ 07601 and subject to the New Jersey Board of Public Utilities.  It has been granted franchise authority subjecting it to state regulation of its rates, service territory, capital expenditures, and infrastructure decisions.  Veolia is a wholly-owned subsidiary of Veolia North America, Inc., a wholly-owned subsidiary of Veolia Environnement S.A., a publicly traded company listed on the Euronext Paris stock exchange with reported worldwide revenue of €11,427,000,000 in the First Quarter of 2026 and claims that its largest global source of "organic growth of revenue by business" from 1Q2025 to 1Q 2026 was in "municipal water".  Its 2025 Annual Report states that "Veolia specializes in PFAS treatment in the USA" with "[o]ver 30 PFAS treatment projects operational in 7 states" in 2025 and will have "100 projects by 2029".

5.  Defendant Borough of Allendale is a municipal corporation organized under the laws of the State of New Jersey, located in Bergen County, with offices at 500 West Crescent Avenue, Allendale, New Jersey.

## JURISDICTION & VENUE

6.  This Court has jurisdiction under and 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367 and also supplemental jurisdiction over the state law claims under principles of pendent jurisdiction.

7.   Venue is proper under 28 U.S.C. §§ 1391(b) and (c), because, upon information and belief, Defendants are domiciled in, do business in, have substantial contacts with and/or may be found in the District of New Jersey, and a substantial portion of the events at issue have arisen and will arise in this judicial district.

## PENDING STATE COURT PROCEEDING

8.   On February 4, 2025, Plaintiffs filed an Order to Show Cause in New Jersey state Chancery Court (Docket No. BER-C-23-25) seeking an injunction on Veolia's building of a per- and polyfluoroalkyl substances ("PFAS") water treatment plant on the Property.  This action was brought by Plaintiffs solely against Veolia.  After motion practice, the Order to Show Cause was granted by the Honorable Nicholas Ostuni, J.S.C.  On March 24, 2025, Veolia filed its Answer and a Third-Party Complaint against Allendale.

9.   On March 26, 2026, Judge Ostuni entered a temporary injunction barring any further activity by Veolia on the Property other than what was previously done to maintain the well located on the Property, namely Well 17.  *See* Order, dated March 26, 2026, attached hereto as Exhibit "A". These restraints remain in place today.

10. On October 3, 2025, Plaintiffs filed a Motion for Summary Judgment seeking to make the temporary restraints permanent and for other relief.  On October 31, 2025, Veolia filed its opposition and a Cross Motion seeking dismissal of the Verified Complaint.  On October 31, 2025, Allendale filed papers in opposition to Plaintiffs' Motion for Summary Judgment.

11. The motion and cross motion were argued in December 2025 and to date there has been no ruling regarding Plaintiffs' request for a permanent injunction.

## FACTUAL BACKGROUND

12. The following chronology reflects the key events establishing Defendants' unlawful

occupation of Plaintiffs' Property and the decades of associated concealment:

**1966**:  The Easement Agreement is executed, granting rights solely for drilling and maintaining a water well, necessary pumping facilities, pipes, and a water main.  No structure, treatment facility, or chemical storage is authorized.

**1991**:  Allendale's engineers (Hazen & Sawyer) formally advise that no aboveground structure is permitted at Well 17 and that the well may need to be abandoned rather than host any treatment facility.  Allendale eventually proceeds with building unauthorized treatment operations anyway.

**Post-September 11, 2001**:  A permanent shed is constructed over the well site without Plaintiffs' knowledge, authorization under the Easement Agreement, or initiation of condemnation proceedings.

**2013**:  Allendale engages Suez Water New Jersey Inc. (Veolia's predecessor) as operator of the Allendale water system.

**August 2020**:  Consulting firm Mott MacDonald is hired by both Allendale and Veolia's predecessor to conduct a "PFAS Feasibility Study" and concludes that Well 17 is unsuitable for a PFAS treatment facility and recommends discontinuing use of the well if water quality falls out of compliance.  For financial reasons, Allendale and Veolia disregard this recommendation.

**2021–2022**:  Allendale conducts a public bidding process and sells its water system to Veolia for $18 million – an amount nearly $9 million more than the next-highest bid, while concealing from voters and Plaintiffs the pre-existing plan to construct a PFAS treatment plant on Plaintiffs' Property.

**November 2024**:  For the first time, Plaintiffs are granted access to the interior of the

shed on their property and discover chemical tanks, a wash basin, water treatment equipment, a high-voltage electrical panel, and SCADA equipment, all installed without their knowledge or consent.

**February 2025**:  Plaintiffs file an Order to Show Cause in New Jersey state court; a temporary injunction is obtained on March 26, 2025, barring further construction activity at the Property, and Plaintiffs' motion seeking to make the temporary restraints permanent is still pending.

**June 3, 2026**:  At a public town hall meeting, a sitting Allendale Councilwoman threatens to "reconfigure the cul-de-sac and build it in front of your house" if the state court does not permit construction on Plaintiffs' Property, thereby confirming the joint and continuing nature of Defendants' unconstitutional conduct.

## EASEMENT AGREEMENT

13. A portion of the Property is governed pursuant to an Easement Agreement dated May 10, 1966, by and between Walter and Ethel Temperlyn and Defendant Allendale (hereinafter the "Easement Agreement").  The Easement Agreement is attached hereto as Exhibit "B".  Purportedly under the Easement Agreement, Defendant Veolia operates Well 17 located immediately adjacent to Plaintiffs' home, between the cul-de-sacs of Ethel Avenue and Meeker Avenue.

14. Prior to Veolia's predecessor in interest, Suez Water New Jersey Inc., purchasing the Allendale Water System, Suez was the appointed operator of the Allendale water system for a decade.  After Suez was acquired by Veolia's parent company, Veolia began utilizing the Property surrounding Well 17 pursuant to governmental authority and the purported acquisition from Allendale of all right title and interest in the Easement Agreement.  Defendant Veolia was

always obligated to operate Well 17 in conformance with the Easement Agreement.

15. There has been continuity of management from Suez in 2013 to Veolia today. Indeed, the Sale Agreement referenced further below was signed by Alen Weland on behalf of Suez – who is the same person currently running Veolia. In other words, the relationship between Allendale and Veolia runs very long and deep based on a decade of common-purpose interactions.

16. The Easement Agreement attached as Exhibit "B" provides in pertinent part:

Easement No. 1:

"for the purpose of drilling and maintaining a water well in, upon and under the premises herein described, together with the necessary pumping facilities and pipes"

and further,

"will at all times endeavor to maintain and present rural atmosphere of the site and remove only such trees as may be reasonably necessary in connection with its use of the premises and shall keep the premises in a neat, level and clean condition and properly landscaped with evergreen trees"

Easement No 2:

"for the purposes of laying and maintaining therein a water main from Beatrice Streat to the premises described in Easement No. 1, for the purpose of access to the lands affected by Easement No. 1 from Beatrice Street"

"it will only enter upon said premises for the purposes of laying and maintaining the aforesaid water main and for the purpose of constructing a suitable driveway from Beatrice Street to the well site and of the maintenance of the same and for no other purpose whatsoever and it will at all times keep the ground upon said right of way in a satisfactory level and clean condition"

## ALLENDALE AND VEOLIA VIOLATE THE EASEMENT

17. Currently located in the Easement Agreement Area is a shed which was previously believed by Plaintiffs to only cover the existing well pump. This shed was shielded behind a natural evergreen buffer before the impermissible cuttings referenced below occurred. The

Easement Agreement does not reference using the Property as a water treatment facility or as a storage site for dangerous chemicals.

18. Because the Easement Agreement does not provide for the construction of a structure over the allowed well and pump, it was constructed in violation of the Easement Agreement. As well, the Easement Agreement only reference the installation of the water main and its maintenance. Indeed, the Easement Agreement expressly provides that the site must be kept "level" and that "maintaining" the water main was permissible under the easement grant but "no other purpose whatsoever" was allowed.

19. On November 26, 2024, Plaintiffs for the first time were granted access to the interior of the shed structure located on the Property. At this site visit, Plaintiffs discovered that the interior of the shed contained chemical tanks, a wash basin, and some form of water treatment facilities. Further, Veolia was in the process of installing a high-voltage electrical panel and SCADA equipment with antenna in apparent preparation for converting what Plaintiffs thought was merely a well into PFAS water treatment plant. Discovery in the state action has revealed that Defendants knew about the need for a new electrical panel and SCADA equipment for PFAS treatment plant construction well before selling its water system.

20. As set forth in the 2020 PFAS Feasibility Study issued by Mott MacDonald – a consulting firm hired by both Allendale and Veolia and further referenced below: "The construction cost estimates for the Well No. 17 PFAS treatment options includes additional improvements including: Concrete foundation; Pre-engineered metal building superstructure; Site pipe modifications including new chlorine contact main; PFAS treatment system; Replacement of well pump; New/Relocation of existing sodium hypochlorite system; **Electrical system upgrade; SCADA system upgrades**." Report at 25.

21. Neither Allendale nor Veolia requested approval or gave any notice to Plaintiffs before making any of the above impermissible installations.  These structural changes are all outside the scope of the permitted uses of the Easement Agreement.

22. Veolia further violated the Easement Agreement by removing mature plantings and trees on the site and abandoning on site the logs, stumps and downed vegetation.  This was in direct violation of Veolia's responsibility to "at all times endeavor to maintain and present rural atmosphere of the site and remove only such trees as may be reasonably necessary in connection with its use of the premises and shall keep the premises in a neat, level and clean condition and properly landscaped with evergreen trees."

23. The removal of the mature plantings and trees eliminated the natural buffer to the impermissible structure constructed on the Property and made this commercial structure further visible to the Plaintiff from their home and to the surrounding neighborhood.  Veolia failed to obtain permits or request approval or give prior notice to Plaintiffs before improperly removing the trees and plantings from the Property.  And, at no point in time did Veolia replace the trees or replant the natural buffer previously present at the Property.

24. In or around April 2024, Veolia committed additional impermissible intrusions on Plaintiffs' Property when it dug the ground by the water main and conducted activities well beyond the mere maintenance allowed by the Easement Agreement.  Upon information and belief, Veolia among other things connected a "zinc orthophosphate (Carus 3200) chemical feed system" to the water main.

25. Some of the precautionary statements found in the applicable product spec sheet for the Carus 3200 include:  "May be corrosive to metals. Causes severe skin burns and eye damage. May cause respiratory irritation. Toxic to aquatic life with long lasting effects.  Do not breathe

mist or vapor. Wear protective gloves/protective clothing/eye protection/face protection. Wash thoroughly after handling. Avoid release to the environment."

26. Upon information and belief, zinc orthophosphate previously was added by Veolia to the Allendale water supply **at the Haworth water supply site** and this new use replaced the Haworth feed.

27. Upon information and belief, Veolia also extended the allocated surface area of the easement to impermissibly encroach upon the Property and further extend its occupation of Plaintiffs' Property.

28. Veolia's installation of a blue painted access point in or around that time was also outside the Easement Agreement.  Upon information and belief, this was also done in preparation for Veolia's conversion of Well 17 into a PFAS treatment plant.  Here is a picture of the shed's cryptic hazard signage and blue painted access point:



29. The greatest injury to Plaintiffs' property rights by Defendants remains their hidden scheme to construct a 35'4" x 21'7" "superstructure" for a PFAS treatment plant on the Property – which would have already begun if not for the Court Order entered by Judge Ostuni. *See* Exhibit "A". The proposed location of this new massive structure is depicted on the plans obtained from Veolia during discovery in the state action.

30. Upon information and belief, the installation of proposed PFAS treatment vessels would require a minimum ceiling height of at least fifteen feet which would make it impossible to adhere to the requirements that the use of the Easement area maintain the rural atmosphere of the site.

31. As depicted in its plans, the construction of any such structure would encompass most of the Easement area without any consideration of the required setback and involve the removal of additional trees and natural landscaping – all in violation of the Easement Agreement's requirement to maintain the rural atmosphere of the site. Because the proposed building would cover most if not all the Easement area, there would not be sufficient area left to properly landscape with evergreen trees, as required by the terms of the Easement.

32. Having a water treatment facility on site was precluded by the Easement Agreement which was only for "the purpose of drilling and maintaining a water well in, upon and under the premises herein described, together with the necessary pumping facilities and pipes" and to "keep the premises in a neat, level and clean condition and properly landscaped with evergreen trees."

33. By way of background, there are only three treatment facilities serving Allendale's five wells. Well 14 treats with sodium hypochlorite and is located on the vast open space known as Crestwood Lake. The Wells 2, 4, and 15 are treated at the New Street Water Treatment Plant

-10-

for VOCs and disinfection with sodium hypochlorite and this treatment facility is located at the Allendale Department of Public Works facility.  Of the three treatment facilities, only Well 17 is in the midst of a residential community, namely Plaintiffs' Property.

34. The water treatment facility currently operating at the Property, and its expansion as proposed by Veolia, were never contemplated by the Easement Agreement or can be found in any contemporaneous documents produced by either Veolia or Allendale during discovery – or even the NJDEP by way of an OPRA request.

35. The Easement Agreement unambiguously only provides for the use and installation of a well and necessary pumping facilities, with no mention whatsoever of water treatment, chemicals, or any structure on the site. The Easement Agreement specifically prohibits the use of the Easement area for any purpose not specifically authorized by the Easement Agreement.

36. The Easement Agreement does not provide for the storage or use of hazardous substances and chemicals at the Property. Despite the foregoing, these hazardous substances are currently being stored and utilized by Veolia at the Property. Further, Veolia sought to expand the storage and use of hazardous chemicals at the Property.

37. Veolia has confirmed that it is currently utilizing Sodium Hypochlorite and Zinc Orthophosphate at the site and proposes to also utilize liquid Ammonium Sulfate on the site  - all in violation of the Easement Agreement.

38. The material safety data sheets evidencing the hazards of the forgoing chemicals run long, including "severe respiratory tract burns" and "severe skin burns".  It should be noted that the levels of sodium hypochlorite and zinc orthophosphate are proposed to increase dramatically as well:

| Chemical | Existing Volume | Proposed Volume | Purpose |
|---|---|---|---|
| Sodium Hypochlorite | 55 gallons | 105 gallons | Disinfection |
| Liquid Ammonium Sulfate | None | 55 gallons | Disinfection |
| Zinc Orthophosphate | 40 gallons | 55 gallons | Corrosion control |

39. Veolia also sought to install PFAS treatment vessels and chemical safety showers at the Property which were never contemplated by the Easement Agreement. Veolia's desire to install chemical safety showers at the site demonstrates that dangerous chemicals are and will be stored at the site where Plaintiffs live with their children in a residential neighborhood.

40. Defendants first built a full-scale water treatment facility at the Property in direct violation of the terms of the Easement Agreement – which only permits the installation and maintenance of a well pump and water main, and have only further encroached from there.

41. Upon information and belief, it is Veolia's intention to treat the water so that same can be combined with its Haworth water supply outside of the original Allendale Water System and thereby further increase profits for the company – which likely explains why "municipal water" is the highest growth aspect of the multi-billion dollars earned by Veolia's ultimate parent.

## COUNT I

**(VIOLATION OF 42 U.S.C. § 1983 BASED ON PLAINTIFF'S DEPRIVATION OF PROPERTY WITHOUT JUST COMPENSATION IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, PARAGRAPH 20 OF THE NEW JERSEY CONSTITUTION)**

42. Plaintiffs repeat and reallege each of the allegations contained in paragraph 1 through

41 of this Complaint with the same force and effect as if fully set forth herein.

43.  Soon after the state action was filed in February 2025, Allendale's position regarding the extent of its claimed rights in Plaintiffs' Property became definitive, irrevocable, and it is now bound by its own sworn discovery responses and official public statements.

44. After suit was filed, Allendale admitted that it constructed permanent facilities and operated them "for decades" and that "there is currently a structure **housing the treatment on this site**".  *See* Message from the Mayor & Council of the Borough of Allendale providing "a historical overview and updates concerning Well 17", distributed May 20, 2025 (hereinafter "Allendale Well 17 Memo") (emphasis added).  The Allendale Well 17 Memo is attached hereto as Exhibit "C."

45. By way of background, for over three decades, Well 17 consisted only of a steel access door for the existing water pump encased in a concrete slab.  Sometime soon after September 11, 2001, the existing shed was placed over this concrete slab.  Upon information and belief, this shed was only to enclose the original exposed steel access door for the water pump as a safety measure likely suggested by the Federal Government after the tragedy of the September 11th attacks.

46.  Again, the shed that was built in 2001 was apparently to enclose the original exposed steel access door for the water pump - what was likely a safety measure suggested by the Federal Government after the tragedy of the September 11th attacks.  This shed in violation of the Easement Agreement was never intended to house a "treatment plant".  Indeed, Allendale **knew beforehand** that it could not operate a "treatment plant" or build a structure on Plaintiffs' residential Property because engineers hired by it **told Allendale as much** as revealed in two reports obtained in the state action.  Moreover, under no stretch of the imagination can a steel

gate door encased in concrete ever assume the role of "treatment plant".

47. And, after the shed was built, the only "treatment" underwent at Well 17 prior to the sale of the Allendale water system to Suez/Veolia, was likely the occasional chlorine bleach poured into the well by Allendale workers using standard size containers transported on site. After the sale, Allendale and Veolia ignored everything they learned about Well 17 and went no-holds-barred in extracting value from Plaintiffs' Property.

48. In 1991, Hazen & Sawyer was retained by Allendale to perform a comprehensive evaluation of the Borough's water system. After evaluating the feasibility and economic justification for future treatment facilities to remove radon from Well 17, the firm found as follows: "The land surrounding Well No.17 is not suitable for installation of the treatment facility because it is located on a residential lot, close to an existing house, and is granted as an easement to the Water Department. **As such no aboveground structure is permitted to be constructed on this site.**" Moreover, after Hazen & Sawyer explored use of another site it determined: "If the property described above cannot be procured, it may be necessary to abandon Well #17 at the time that the USEPA radon registrations take effect, since no other suitable locations for the treatment facility are evidenced at this time under the current zoning scenario."

49. Upon information and belief, there is no radon treatment facility at the Property yet Well 17 was never closed, is still an active well that pumps water to this day and has had readings for Radon that exceed the USEPA standards.

50. In a report dated August 7, 2020 titled "Borough of Allendale PFAS Treatment Feasibility Study", consulting firm Mott MacDonald provides Allendale with options regarding PFAS remediation after acknowledging in the first paragraph: "PFAS contamination has been

detected in the Borough of Allendale's five water supply wells, Well Nos. 2, 4, 11, 15, and 17."
This "PFAS Feasibility Study" states as follows: "Based on the constraints associated with the
three current treatment facilities, Mott MacDonald determined that consolidation of treatment
from the current three treatment facilities down to two treatment facility locations **would be the
most economical approach to providing treatment**. This PFAS treatment feasibility study
evaluates treatment options for the following two proposed facilities: New Street WTP PFAS
Treatment Facility [and] Well No. 17 PFAS Treatment Facility: Provide PFAS treatment for
Well No. 17 at the Well No. 17 site. This option would required [sic] re-configuration of the
existing cul-de-sac to allow sufficient space for a new treatment facility." Report at 1 (emphasis
added).

51. After evaluating the feasibility of all options, the Mott MacDonald PFAS Feasibility
Study concludes: "After consideration of the various options, limited capacity of 150 gpm and
estimated construction cost, the final recommendation is to continue monitoring the water quality
at Well No. 17 **and discontinue the use of the Well when the water quality is no longer in
compliance with the regulations.**" Report at 27 (emphasis added). In other words, in 1991
Allendale was advised that Well 17 could not house any structure or be used as a water treatment
plant and in 2020, Defendant Allendale and Suez/Veolia were advised that Well 17 would not be
suitable as a PFAS treatment plant. Allendale has offered no excuses for its transgressions.

52. Allendale's Statement of Undisputed Material Facts, filed October 31, 2025 in
opposition to Plaintiffs' Chancery Division Motion for Summary Judgment, states that Well 17 is
used pursuant to the Easement Agreement – which prescribes anything beyond its express terms.
In the same document, Allendale also states: "In addition to the well pump, **a separate chlorine
pump was continuously utilized on site for the injection of chlorine into the system**".

-15-

Statement No. 11. *See also* Statement No. 19 (acknowledging that "there was an existing structure on the premises, and within the structure there was a well, pumping facilities (including a chlorine pump), appurtenances and treatment equipment (including the use of chlorine) for the maintenance of the well and pumping facilities."). Accordingly, Allendale simultaneously recognizes that it was bound by an easement that grants rights solely "for the purpose of drilling and maintaining a water well in, upon and under the premises herein described, together with the necessary pumping facilities and pipes" while also acknowledging the Property contains so much more without ever bothering to offer any deed, conveyance, or contemporaneous document authorizing those additional uses.

53. Allendale admits the easement covers only a well and its water pump, denies that its additional use violated that easement, and cannot produce a single document broadening the grant. In essence, Allendale contorts logic by admitting the grant was limited to a well and water pump while denying that construction of a building, operating treatment plants, and storing chemicals violated that limited grant. This position, taken together with the Hazen & Sawyer and Mott MacDonald findings, forecloses any prescriptive easement defense as a matter of law given that Allendale is a governmental entity that knew its use was unauthorized, was told so by its own engineers, and concealed that improper use from all property owners, including Plaintiffs. Allendale cannot claim prescriptive rights through the very occupation it was advised never to begin.

54. Despite the professional insight given it, Allendale inflated its purported rights in the Easement Agreement and sold it to through a statutory public bidding process under N.J.S.A. 40:62-3 – all the while warranting at the closing that it held "good, marketable and valid title" to sufficient to convey such rights. Upon information and belief, it was this improper taking of

Plaintiffs' Property that caused Veolia's predecessor to pay nearly nine million dollars more than the next highest bidder.

## STATUTORY AND CONSTITUTIONAL FRAMEWORK

55. 42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

56. The Fifth Amendment to the United States Constitution bars the federal government from taking private property "for public use, without just compensation".  U.S. Const. amend. V. The Fourteenth Amendment makes this prohibition also fully applicable to the acts of Allendale. U.S. Const. amend. XIV, § 1, cl. 2.

57. Article I, Paragraph 20 of the New Jersey Constitution independently also states: "Private property shall not be taken for public use without just compensation." New Jersey's just compensation guarantee is independently enforceable and is at least as protective of property rights as its federal counterpart. Accordingly, the New Jersey Constitution stands as an independent and parallel source of constitutional protection afforded Plaintiffs.

58. Defendants are "persons" subject to suit under 42 U.S.C. § 1983.

59. Allendale was the owner and operator of the Allendale public water supply, treatment, distribution, and storage system from its inception through 2013 when it engaged Veolia's predecessor Suez as operator of the Allendale water system, and through approximately March 2023 when it formally transferred the system to Defendant Veolia. As Allendale publicly

confirmed, Allendale sold its water system because it was "faced with regulatory violations, aging infrastructure and lack of technical expertise."

60. Allendale acted under color of state law in exercising its authority to develop, operate, and commercialize the Borough's public water supply system, including Well 17.

**THE EASEMENT AGREEMENT: A NARROW AND UNAMBIGUOUS GRANT**

61. The Easement Agreement grants rights solely "for the purpose of drilling and maintaining a water well in, upon and under the premises herein described, together with the necessary pumping facilities and pipes." Allendale further covenanted that it "will at all times endeavor to maintain and present rural atmosphere of the site and remove only such trees as may be reasonably necessary in connection with its use of the premises and shall keep the premises in a neat, level and clean condition and properly landscaped with evergreen trees."

62. The Easement Agreement grants further rights solely "for the purpose of laying and maintaining therein a water main from Beatrice Street to the premises described in Easement No. 1," and Allendale covenanted that "it will only enter upon said premises for the purpose of laying and maintaining the aforesaid water main and for the purpose of constructing a suitable driveway from Beatrice Street to the well site and of the maintenance of the same and for no other purpose whatsoever."

63. Accordingly, the Easement Agreement unambiguously authorizes a well, necessary water pumping facilities and pipes, and a water main access route – and nothing else. It does not authorize construction of any shed or building. It does not authorize a water treatment plant or chemical storage. It does not authorize connecting the water main with any treatment tanks or non-maintenance activities. It expressly bars use of the Property "for any other purpose whatsoever" and requires the site to be maintained "level" and landscaped with evergreen trees.

-18-

64. As recognized by Judge Ostuni on March 17, 2025 during the preliminary injunction hearing, "the easement language could not be more clear.  It could not be more clear.  It is for a pump, a well, and pipes leading from that pump and well, and for the maintenance of the pipes, and the well. And a driveway to make sure the pump, and the well are working."  *See* T31:7 – 11.

65. Allendale's public statements also confirm that any treatment designation at this site is a distinct classification from that of a well. In the Allendale Well 17 Memo, Allendale states: "The site has been listed in NJDEP's Water Watch as a Well (WL004006) **and** a Treatment Plant (TP004020) for more than twenty years."  Exhibit "C" at 1 (emphasis added).   In effect, Allendale concedes that it constructed and operated Well 17 as a treatment plant without ever attempting to condemn the property or negotiating for the additional property rights required to do so.

### **ALLENDALE'S UNCONSTITUTIONAL PHYSICAL TAKINGS**

66. Notwithstanding the narrow and express scope of the Easement Agreement, Allendale acted under color of state law and pursuant to its official governmental policy of developing and operating the Borough's public water supply to physically and permanently occupy Plaintiffs' Property far beyond its lawful grant, without ever initiating condemnation proceedings and without paying any compensation.

67. Defendants physically occupied Plaintiffs' Property in the following ways, each constituting an unauthorized and appropriation of property rights never conveyed by the Easement Agreement:

(a) **Construction of a Permanent Structure.**  The Easement Agreement authorizes no structure of any kind. It requires the site to be kept "level" and prohibits

any other use "whatsoever." The construction of a permanent building on Plaintiffs' Property in or around September 2001 was a physical taking of property rights Allendale never lawfully acquired.  After the state suit was filed, Allendale publicly admitted that "there is currently a structure housing the treatment on this site."  Exhibit "C" at 1.

(b) **Installation of Water Treatment Facilities.**  The Easement Agreement contains no provision permitting water treatment operations, chemical use, or industrial activities of any kind. Allendale's public admissions are explicit and unambiguous.  *See e.g.*, Exhibit "C" at 1 ("The Borough has been treating the water at this location for decades and there is currently a structure housing the treatment on this site.").  The site has been registered with NJDEP not solely as a well but also as a "Treatment Plant (TP004020) for more than twenty years." *Id*.

(c) **Storage and Use of Hazardous Chemicals.**  Unbeknownst to Plaintiffs, Allendale stored and utilized hazardous chemicals on the Property "for decades", including sodium hypochlorite and more recently zinc orthophosphate. Without the benefit of any documentation as regards the date of first use, Allendale has publicly stated: "Water from Well 17, as with all Allendale wells, has been treated **for over 30 years** with sodium hypochlorite (concentrated household bleach) to kill potential pathogens." Exhibit "C" at 1 (emphasis added).  In addition, "zinc orthophosphate is also added for corrosion control." Exhibit "C" at 2.  The Easement Agreement does not provide for, nor contemplate, the use of the Property as a water treatment plant for the Allendale water system or for the use and storage of chemicals on site. These uses are additional unauthorized physical occupations of Plaintiffs' Property for which no compensation was ever paid.  More to the point, it was not until November 2024 until

Plaintiffs became aware of such usage.

(d) **SCADA System and Antenna.**  Allendale additionally installed a Supervisory Control and Data Acquisition ("SCADA") system and antenna on the Property to monitor Well 17. Neither a SCADA system nor any antenna or telecommunications equipment is authorized by the Easement Agreement. Allendale's document production responses disclose the existence of these installations. Each such installation constitutes an additional unauthorized physical occupation of Plaintiffs' Property.

68. Allendale's sworn submissions in the state court proceeding state that the chemical treatment activities at Well 17 were continuous and conducted pursuant to official Borough policy.  The Certification of Layne Simon, a former Allendale employee who worked in the Allendale Water and Sewer Department from April 1, 1988 through March 1, 2022 and served as a licensed water system operator, states under oath: "Well 17 was utilized as a water treatment facility."

69. The 1993 Worker and Community Right to Know Act Survey, submitted as Exhibit "B" to the Simon Certification, identifies the facility as "Well #17, Meeker Avenue" and describes its operations as "Water Well Production & Disinfecting same," with sodium hypochlorite listed as a hazardous chemical present on site.   A 1999 record issued by the New Jersey Department of Environmental Protection, Bureau of Safe Drinking Water, submitted as Exhibit "D" to the Simon Certification, classifies the Allendale Facility ID 04 as a "Treatment Plant Facility" receiving "Disinfection – Hyperchlorination, Post" treatment at the Meeker Street/Well 17 location.  This confirms that the State of New Jersey itself recognized and registered this site as a treatment plant, not merely a well.  Allendale's Interrogatory Response

No. 22 confirms Allendale knew of this NJDEP classification at the time of the 2022 sale to Veolia.

70. Allendale compounded its constitutional violations when it formally sold the water system to Veolia for an inflated commercial value based on its unlawful expanded occupation of Plaintiffs' Property.  On or about April 7, 2021, acting pursuant to N.J.S.A. 40:62-3, Allendale formally initiated a governmental process to sell its entire public water supply system, including all easements. Allendale advertised and issued a Request for Bids.

71. On May 28, 2021, Allendale apparently received bids from two utilities. Allendale determined that Veolia submitted "the highest responsible bid" at $18 million and awarded Veolia the system.  Allendale voters approved the sale of the water system through a public referendum.  Upon information and belief, the next highest bid was approximately $9 million.

72. Upon information and belief, Veolia internally believed the Allendale water system was only worth approximately $4 million but believed it was an important part of Veolia's future as it looked into additional local water systems to purchase.  To that end, Well 17 itself was a very important part of the purchase because it impacts the potential purchase of **other town's water systems** and is likely why water from this well has been moved toward the Ramsey side of Allendale.

73. The Sale Agreement, executed on or about March 24, 2022, defined the "Purchased Assets" to include "all of the Borough's rights and interests under the Easements held by the Borough," and specifically identified Plaintiffs' Property, namely "Block 404, Lot 15, 7 Ethel Avenue", as providing an easement "necessary and required to operate the System."

74. As stated by former Allendale Council President and current Councilwoman Liz Homan on May 21, 2025 in an email when addressing complaints regarding the Allendale Well

17 Memo:  "Had the residents of Allendale not voted to sell the system, and Allendale Water retained ownership, **the plan was to construct a PFAS treatment facility for this well at the site.** It's important to note that **this well has been maintained by the Borough with sodium chloride disinfectant treatment for decades**. We cannot disregard all the history of this well **and treatment building** simply because the ownership has changed."

75. Ms. Homan is correct in that Allendale formally transferred and assigned the Easement Agreement to Veolia, including the building, equipment, treatment infrastructure, chemicals, and other modifications Allendale installed on the Property but ignores that such "treatment building" exceeded the easement's scope – as was Allendale's "plan" to "construct a PFAS treatment facility" on Plaintiffs' Property.

76. Upon information and belief, Allendale informed Veolia during sale negotiations that it would do whatever was necessary to have Veolia obtain a PFAS treatment plant on Plaintiffs' Property.  Moreover, Allendale warranted to Veolia that it held "good, marketable and valid title to all of the Purchased Assets" and that there were "no existing defaults or events of default" under any of the easements conveyed. Both warranties, however, were false as to the expanded facilities Allendale had installed without authorization.  Ultimately, Allendale received a grossly inflated bid price for a package of assets that included inflated property rights in Plaintiffs' property Allendale never lawfully acquired, never paid for, and had no right to convey.

77. Veolia's Director of Engineering, Antonio Vicente, P.E., certified under oath in the state litigation that the cost to relocate the PFAS treatment facility away from Plaintiffs' Property is "estimated to be around $16.5 million."  This sworn admission represents the floor of the value that Veolia itself assigns to the right to occupy Plaintiffs' Property for a PFAS treatment plant. A meaningful portion of the $18 million bid price that exceeded the next-highest bid by

approximately $9 million, while, upon information and belief, Veolia internally estimated the entire system was worth only approximately $4 million.  This all points in only one direction, namely that the inflated sale price was attributable to Defendants' unlawful appropriation of Plaintiffs' property rights.  Plaintiffs received none of the rightful consideration for this transaction.

78. After the purchase of Allendale's water system, Veolia received pushback from Plaintiffs regarding the construction of a PFAS treatment plant on Plaintiffs' Property.  Feigning neutrality as regards Well 17, on December 17, 2024, then Borough Council President Liz Homan wrote to Veolia's Alan Weland, providing maps of Borough-owned properties and state open space parcels that might serve as alternative PFAS treatment sites.

79. In the May 20, 2025 Allendale Well 17 Memo, Allendale publicly discloses: "The most recent test at Well 17 (TP004020) shows **an 8.24 ppt result for PFOA, more than double the EPA maximum contaminant level.**  Effective April 2024, the EPA maximum contaminant level for PFOA is 4 ppt.  *See* Exhibit "C" at 2; 40 C.F.R. Part 141.  The 8.24 ppt result at Well 17 is thus more than double the applicable federal regulatory limit, independently establishing that Well 17 presents a documented public health risk that Defendants have failed to address through the only lawful means available to them, namely closing the well as recommended by their own consultant. Veolia and Allendale disregarded Mott MacDonald's August 7, 2020 recommendation regarding potential PFAS contamination at Well 17: "After consideration of the various options, limited capacity of 150 gpm and estimated construction cost, the final recommendation is to continue monitoring the water quality at Well No. 17 **and discontinue the use of the Well when the water quality is no longer in compliance with the regulations**." (emphasis added).

-24-

80. The PFAS contamination at Well 17, when coupled with Defendants' scorched earth approach towards building a PFAS treatment facility on site and the NJDEP "treatment plant" designation, create an independent and significant source of diminution damages to Plaintiffs' Property. The Property is registered in NJDEP's Water Watch both as a well (WL004006) and as a Treatment Plant (TP004020). This registration constitutes a material fact that likely must now be disclosed in connection with any future sale of Plaintiffs' Property. Well 17 remaining open despite documented PFOA levels exceeding twice the federal maximum contaminant level and apparent radon contamination further compounds this disclosure obligation. These facts independently and materially impair the marketable value of Plaintiffs' Property, regardless of whether any further construction activity ever occurs at the site. Again, the fact Well 17 was kept open despite apparent radon contamination – in contravention of Hazen & Sawyer's expert advice, raises Plaintiffs' diminution damages and illuminates on Allendale's true intentions.

81. As regard the PFAS contamination, instead of taking Mott MacDonald's advice and closing Well 17, Allendale continued with a more subtle taking from Plaintiffs by doing what it could to assist Veolia in building a PFAS treatment plant on the Property – a treatment facility that was only prevented by Court Order. The impact of this and other related very public efforts of Defendants was an immediate and drastic reduction in the marketable value of Plaintiffs' Property.

82. When Plaintiffs had no choice other than to file an Order to Show Cause application in state court regarding commencement of this PFAS treatment facility, Defendants Veolia and Allendale doubled down on their activities and went on a scorched earth attack implying that Plaintiffs' actions were somehow preventing residents from having clean water. *See* Exhibit "C" at 2 ("There is now a lawsuit and unfortunately the Borough has been brought into it. The

question of overburdening the easement by adding the PFAS filters is being decided in court. Veolia has been instructed by the judge NOT to pursue the installation of PFAS treatment at Well 17 at this time. The most recent test at Well 17 (TP004020) shows an 8.24 ppt result for PFOA, more than double the EPA maximum contaminant level. . . .This is a complex situation in which Veolia is responsible for providing clean drinking water to all Allendale residents but has now been ordered by the court to stop the planning process to filter PFAS at this site, which provides 20% of the water to our residents").

83. Upon information and belief, this public statement by Allendale was made in coordination with Veolia because the Sale Agreement states in Exhibit G at 20 of the sale agreement: "The Parties agree to cooperate on any formal public announcement or statement regarding this Agreement or the transactions contemplated herein. Each Party shall make a good faith effort to provide the other with advance notice of the proposed content of any public announcement or statement."

84. On February 3, 2025, Veolia Director of External Affairs Katherine Wysokowski advised Allendale that "while a thorough property search for vacant/sale properties has been conducted, we have not been successful in identifying any properties for PFAS treatment." Allendale itself publicly admitted that "due to the optimal location of Well 17, exploring alternate sites has been a challenge."

85. Allendale misappropriated private property for public use without paying for it, then sold those misappropriated rights to a private corporation for significant commercial gain – pocketing the proceeds for the public treasury while the property owner was left with an industrialized easement, loss of land use, and no compensation. The Fifth Amendment was designed to exactly bar Government from forcing some people alone to bear public burdens

which, in all fairness and justice, should be borne by the public as a whole.

## CONCEALMENT AND CONTINUING VIOLATIONS

86. Allendale actively concealed its unauthorized occupation of Plaintiffs' Property for decades.  Plaintiffs purchased the Property in 2019 with an easement for a water well and water main.  Defendants never informed Plaintiffs of the NJDEP's registration of the site as Treatment Plant TP004020, never disclosed the chemicals stored on the Property, and never informed Plaintiffs that a PFAS treatment plant was being planned for construction on the Property.  Plaintiffs had no knowledge of the material violations of the Easement Agreement until November 2024, when they were first granted access to the shed's interior.  Each fresh installation, chemical use, and affirmative act of concealment, including by way of Allendale's warranty of good title in the 2022 Sale Agreement, while knowing of these unauthorized uses constitutes a continuing wrong and an independent violation, and tolls any applicable statute of limitations.

87. The unconstitutional taking set forth in this action is ongoing and escalating.  Each day that Veolia continues to operate an unauthorized NJDEP-registered Treatment Plant on Plaintiffs' Property constitutes a continuing violation.  As recently as June 3, 2026, a sitting Allendale Councilwoman publicly threatened to "reconfigure the cul-de-sac and build it in front of your house" in response to Plaintiffs' exercise of their constitutional rights.  This statement which is further referenced is consistent with the decades-long pattern of deliberate governmental appropriation of Plaintiffs' property without compensation.

88. Allendale's unconstitutional takings were the product of official municipal policy and practice.  As set forth further below, Veolia stands in the same shoes as Allendale given its joint coordination with Allendale and functional equivalence as regards conduct involving Well 17.

89. Allendale's activities squarely fit under 42 U.S.C. § 1983.  The original construction of the shed and pumping facilities on the Property was undertaken pursuant to Allendale's official policy of developing and operating its municipal public water system under state statutory authority. The Borough's governing body authorized and directed the October 4, 1965 drilling of Well 17 and the execution of the Easement Agreement.

90. The decision to install water treatment equipment inside the shed was a deliberate policy choice by Allendale's governing body. As the Mayor and Council expressly acknowledged, the decision to secretly treat water at this location with unknown quantities of sodium hypochlorite and other chemicals was made and sustained by Borough officials across multiple administrations.

91. The decision to secretly operate the well site as a registered NJDEP Treatment Plant (TP004020) for "more than twenty years" without seeking condemnation authority, without notifying the Property owners of this expanded use, and without paying compensation, was a sustained, consistent, and knowing policy choice by the Borough's governing body and administrative officials.

92. The institutional, policy-driven character of Allendale's conduct is further confirmed by the Borough's own financial records produced in the state action during discovery.  Budget and purchase order records for the Allendale Water and Sewer Department, spanning at least the years 2010 through 2014, reflect hundreds of line-item expenditures for sodium hypochlorite, chlorine pumps, treatment chemicals, and operational maintenance at Well 17 – including recurring purchase orders to Miracle Chemical Company and ESC Enterprises for sodium hypochlorite, and invoices for VOCS testing, bacteriological testing, and chlorine feed equipment specifically at the Well 17 site.

93. These records establish that operating Well 17 as a water treatment plant was a budgeted, recurring, institutionalized municipal function implemented through the Borough's formal procurement processes across multiple administrations and budget cycles.  Each such expenditure was a deliberate policy decision by the Borough's governing body to maintain and expand an unauthorized industrial use of Plaintiffs' residential property without notice or compensation.

94. The decision to sell the system with unlawfully expanded property rights in Plaintiffs' Property was a formal act of Allendale's governing body, taken pursuant to N.J.S.A. 40:62-3, subject to public notice, competitive bidding, a public referendum in which Allendale voters "overwhelmingly approved the sale of the water system", and formal resolution.  Exhibit "C" at 2.  The decision to warrant "good, marketable and valid title" to those expanded rights was equally a deliberate act of Allendale's governing body.

95. Faced with the Hobson's Choice provided to Allendale's residents; no resident would vote against the sale – which is why it was "overwhelming" approved.  The November 2, 2021 General Election Ballot speaks volumes regarding Defendants' scheme:

> ALLENDALE WATER SYSTEM PROPOSAL "Shall the Borough of Allendale, in the County of Bergen, New Jersey, be authorized to sell its water supply, storage, treatment and distribution system (commonly known as the "water system") to Suez Water New Jersey Inc. for **the sum of $18,000,000**?"

> EXPLANATION If a majority of the legal votes cast in the Borough are "yes", the Borough of Allendale will sign an agreement with Suez Water New Jersey Inc. for the **sale of water system servicing the residents and property owners within the geographic boundaries of the Borough** in the amount of $18,000,000. This agreement provides that Suez Water New Jersey Inc. will provide and maintain all water services to the existing customers of the Borough's water system and will make substantial capital improvements to such system **in accordance with the terms of the Agreement of Sale approved by the Borough**. Subject to the final review and approval of the New Jersey Board of Public Utilities, the service rates to the customers of the Borough's System are proposed to be changed as follows for up to a maximum of 10 years following the sale:

| Year | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 |
|------|------|------|------|------|------|------|------|------|------|------|
| Rate Increase | 0% | 0.5% | 0% | 0% | 5% | 0% | 5% | 0% | 0% | 5% |

Upon the completion of the rate schedule approved by the Board of Public Utilities future rate changes shall be subject to approval by the New Jersey Board of Public Utilities. If a majority of the legal votes cast in the Borough are "no", the Borough will retain the water system and **will immediately begin a process to increase water rates to the extent required to address the need for additional treatment technology and maintenance activities.**

96. Based on the above Official Statement for this vote, Allendale would receive $18 million for future use, rates would stay fairly flat for a decade, the water system would not reach out to residents outside Allendale, and the utility would not seek rate increases from the BPU for "its substantial capital improvements" given it agreed to flat rates for a decade. This clever scheme, however, required adherence to the Sale Agreement – which was never provided for public scrutiny.

97. Despite these representations and Allendale's prior knowledge of its "plan" to build a PFAS treatment facility by Well 17, the Sale Agreement curiously lists no plans for constructing a PFAS treatment facility by Well 17 – again, even though Ms. Homan states in her May 2025 email that Allendale's prior "plan" was to have a PFAS treatment facility on Plaintiffs' Property. In sharp contrast, the Sale Agreement contains "Exhibit L" titled "BUYER'S PFAS PLAN" that makes **no mention whatsoever of Plaintiffs' Property** – only the yet-to-be-built "New Street Treatment Plant". Allendale also held pre-vote events where they spoke about PFAS treatment but only on New Street and only with maps on display that showed the New Street intended site. Moreover, Ms. Homan's Facebook video on this topic also only talks about New Street as the intended site. This New Street facility is where the Allendale DPW is located and is not adjacent to any residence – as is the only other water treatment plant in Allendale. *See Supra* ¶ 33.

-30-

Plaintiffs' Property has the outlier secret treatment plant found right in Plaintiffs' front yard.

98. Upon information and belief, Veolia is now looking to substantially increase rates well beyond what is set forth above in the referendum's Official Statement.  Upon information and belief, Veolia has begun or will soon begin using the Allendale water system to service other towns.  Veolia is apparently reneging on its prior contractual commitments because it failed to receive the "hidden" commitment from Allendale, namely the ability to run roughshod over Plaintiffs' Property and build whatever it likes whenever it likes, including a PFAS treatment facility in Plaintiffs' front yard.

99. Throughout the entire arc of Allendale's conduct – from the initial improper construction of the shed through the formal closing of the Veolia sale – Allendale never initiated condemnation proceedings under the New Jersey Eminent Domain Act of 1971, N.J.S.A. 20:3-1 et seq., never informed Plaintiffs or others living near Well 17 what was taking place on the Property, never offered any compensation to the owners of the Property, and never took any steps to acquire through lawful means the additional property rights it claimed and ultimately sold.

100.    Each of the known physical occupations described in this Complaint, including placement of a permanent structure, chemical treatment operations, hazardous chemical storage, the SCADA system and antenna, and an executed scheme to build a PFAS treatment facility on Plaintiffs' Property, each independently constitute a *per se* compensable taking regardless of the public interest served or the physical space occupied.  The just compensation owed to Plaintiffs consist of the fair market value of each property right taken, measured from the date of each taking; severance damages for the diminution in value of the Property as a whole caused by the NJDEP's registration of the adjacent easement area as an industrial Treatment Plant (TP004020);

diminution damages from the sustained presence of hazardous chemicals adjacent to Plaintiffs' home, the improper designation of the Property, and the pursuit of a PFAS treatment plant on the Property; and disgorgement of an equitable share of the $17,207,000 in net sale proceeds Allendale retained after conveying property rights in Plaintiffs' land it had never lawfully acquired.

101.    Plaintiffs purchased the Property in 2019 with an easement for a water well and water main, not any water treatment plants. Since then, Plaintiffs have been compelled to live adjacent to an industrial treatment plant: a permanent structure housing chemical storage and treatment equipment; sodium hypochlorite, zinc orthophosphate and other toxic chemicals stored and used on-site; an antenna and SCADA monitoring equipment; and, now, a proposed massive PFAS treatment installation consisting of large filtration vessels. All the while, this industrial activity is conducted adjacent to Plaintiffs' private residential home where they reside with their three children.

### VEOLIA ALSO VIOLATED 42 U.S.C. § 1983

102.    Veolia is also liable under 42 U.S.C. § 1983 because when a private party such as Veolia acts jointly with state officials in depriving a citizen of a constitutional right it acts under color of state law.  The joint action between Veolia and Allendale in the taking of Plaintiff's property interests is well documented and substantial.

103.    Veolia and Allendale acted in concert throughout their campaign against Plaintiffs.  For example, the Sale Agreement at Exhibit G on page 20 expressly requires the parties to "cooperate on any formal public announcement or statement regarding this Agreement or the transactions contemplated herein," and obligates each party to "make a good faith effort to provide the other with advance notice of the proposed content of any public announcement or

statement."

104.    Upon information and belief, the many public statements by Allendale blaming Plaintiffs for threatening the Borough's water supply were made in coordination with Veolia pursuant to this cooperation clause. The commercial value attached to Plaintiff's Property and the need for tightly knit joint conduct are confirmed by the sworn Certification of Antonio Vicente, P.E., Veolia's Director of Engineering, who states under oath in the state action that the cost to move to an alternative site the PFAS treatment facility Veolia long planned for Plaintiffs' Property is "estimated to be around $16.5 million." That figure represents the minimum market value of the property rights Defendants misappropriated from Plaintiffs with Plaintiffs receiving no compensation.

105.    The Sale Agreement required the parties to coordinate all public statements; Allendale's Council President communicated directly with Veolia's General Manager Alan Weland regarding alternative PFAS sites despite knowing from the start of their "plan" to use Plaintiffs' Property; Veolia's Director of External Affairs Katherine Wysokowski was in active communication with Allendale officials regarding the Borough's public messaging; and the Allendale Well 17 Memo blaming Plaintiffs for the Borough's PFAS crisis was issued pursuant to the Sale Agreement's coordination covenant. Veolia and Allendale both knew before the Sale Agreement closed that the PFAS treatment plant would be built on Plaintiffs' Property, yet they concealed this from Allendale's voters in a coordinated act of governmental and private deception that caused Plaintiffs' property to be pledged, without their knowledge or consent, as the foundation of a multi-million dollar commercial enterprise.

106.    The Sale Agreement between Allendale and Suez Water New Jersey, Inc. (subsequently renamed Veolia Water New Jersey, Inc.), dated March 24, 2022, as amended June

30, 2022, and consummated at closing on November 30, 2022 (the "Sale Agreement"), provides compelling evidence of the coordination between Allendale's former operator and their unconstitutional taking. Every material term of the Sale Agreement – from its definition of the purchased assets to its representations and warranties, to the executed closing documents, demonstrates that Allendale knowingly conveyed to Veolia property rights in Plaintiffs' land that Allendale had never lawfully acquired, while simultaneously certifying to Veolia that no such defect existed.

107.    The Bill of Sale executed by Allendale's Mayor Ari Bernstein at the November 30, 2022 closing included, as Schedule I of the Included Assets, the following specifically named facility: "2.4. Meeker Street Treatment Plant." This designation is unambiguous and appears in both Exhibit A to the Sale Agreement and in the executed Bill of Sale delivered at closing. Allendale did not sell a "Well 17." It did not sell a "pumping station." It sold, by name, a "Treatment Plant" located on Meeker Street, which is Well 17 that was previously constructed and operated on Plaintiffs' Property. The Easement Agreement authorizes no treatment plant of any kind. The word "treatment" does not appear in the Easement Agreement. Yet Allendale included the "Meeker Street Treatment Plant" in its $18,000,000 deal, as reflected in the executed Settlement Statement, without paying Plaintiffs fair compensation.

108.    The Assignment and Grant of Easements, Rights of Way and Other Property, executed by Mayor Ari Bernstein and by Veolia then Vice President and General Manager Alan Weland on November 30, 2022 (the "Easement Assignment"), assigned to Veolia "ALL Grantor's right, title and interest" to a list of easements set forth in Schedule I to the Easement Assignment. That Schedule I identifies seventy-five or more separate properties by block and lot number. Easement Number 13 on that list is Block 404, Lot 15, the precise tax map designation

for Plaintiffs' Property at 7 Ethel Avenue, Allendale. Allendale thus specifically, individually, and by name conveyed to Veolia whatever rights Allendale claimed in Plaintiffs' Property. Plaintiffs were not parties to that conveyance, were not notified of that conveyance, received no consideration for that conveyance, and were not consulted before their property was transferred for industrial use.

109.    The Sale Agreement required Allendale to make, and at closing Allendale certified as "true and correct as of the Closing Date," the following representations and warranties:

(a) **Title Warranty (Section 2.1(C)).** Allendale represented and warranted: "To the Borough's knowledge, the Borough has good, marketable and valid title to all of the Purchased Assets, subject in each case to the Permitted Encumbrances" and that Schedule 2.1(C) of the Disclosure Schedule set forth any exceptions. Schedule 2.1(C) was disclosed as "NONE."   Allendale's only permitted encumbrance  in Plaintiffs' Property was the narrow Easement Agreement, which authorized a water well, pumping facilities, and a water main but nothing else. Allendale had no title to, and no right to convey, the additional property rights necessary to operate a water treatment plant, store chemicals, construct a permanent building, install SCADA equipment and antenna, or remove the natural landscaping buffer. By warranting good and marketable title to these expanded operations with no disclosed exceptions, Veolia acquired rights Allendale could not provide.

(b) **No-Default Warranty (Sections 2.1(L) and 2.1(P).** The Borough broadly represented and warranted, as to all real property interests including the easements set forth in Exhibit N of the Sale Agreement, and Regulatory Compliance and Permits that

"there are no existing defaults or events of default . . . on the part of the Borough" and fail to list any exceptions in the Disclosure Schedule. The construction of a permanent structure on Plaintiffs' Property, the operation of water treatment facilities and chemical storage therein, the installation of SCADA equipment and antenna, failure to obtain permits as required for any such changes, and all other improvements beyond the scope of the Easement Agreement constituted existing, ongoing, and material defaults by Allendale under the Sale Agreement. Allendale's Mayor certified at closing that no such defaults existed.

(c) **Compliance Warranty (Sections 2.1(G) and 2.1(Q)).** Allendale warranted that "the System is in compliance with all State, federal, and local laws and regulations" (Schedule 2.1(G): "NONE") and that the Borough was "in full compliance with all Laws" applicable to the operation of the System (Schedule 2.1(Q): "NONE"). Operating a water treatment plant in excess of the authority granted by the Easement Agreement, without obtaining the additional property rights required to do so, constitutes a violation of Plaintiffs' constitutional property rights and a breach of the governing easement instrument, each of which is a violation of law that Allendale was required to disclose and chose not to.

110.    The ten-year capital improvement plan incorporated into the Sale Agreement as Exhibit K explicitly identifies planned capital expenditures at "Well No. 17 (Meeker Ave)," including: a Gravel Sump for Waste Stream for Chlorine Analyzer; a New Emergency Generator; and SCADA improvements. These are not maintenance items for a well. A gravel sump for a waste stream associated with a chlorine analyzer is chemical treatment infrastructure. An emergency generator at an industrial treatment facility is industrial infrastructure. SCADA

improvements are command-and-control systems for a treatment plant operation, more particularly the PFAS treatment operations. All these planned expenditures were expressly negotiated into the purchase price. All of them relate directly to treatment plant operations at Plaintiffs' Property unbeknownst to Plaintiffs as well as future undisclosed plans for a PFAS treatment facility.

111.    Upon information and belief, while Veolia and Allendale both knew they would build the PFAS treatment plant on Plaintiffs' Property and conspired to keep their true intentions regarding the proposed PFAS treatment plant hidden so that the Sale Agreement would be approved by Allendale residents.  It is no surprise this was done when one takes into consideration the Certification of Antonio Vicente, P.E., Director of Engineering for Veolia, that was filed in this matter on April 4, 2025.  Mr. Vicente states on paragraph 25 of his sworn Certification that the cost to replace the PFAS treatment plant Veolia wants on Plaintiffs' Property is "estimated to be around $16.5 million".  This is worth repeating.  Veolia would have to spend $16.5 million to use a location other than Plaintiffs' Property.  As a sophisticated long-time player in this space backed by a multi-billion dollar publicly traded company, there is little chance Veolia did not know as much long before the ink was dry on the Sale Agreement.

112.    Under Section 12.2 of the Sale Agreement, Allendale agreed to indemnify and hold Veolia harmless from "any inaccuracy in or breach of any representation or warranty made by the Borough" in connection with the transaction. Given Veolia asserted indemnification claims against Allendale arising from the easement defects at Plaintiffs' Property, Plaintiffs are entitled to an equitable share of the $17,207,000 (depending on the final survey cost and escrow release) in net sale proceeds that Allendale received, in an amount reflecting the commercial value of the unlawfully expanded property rights at Plaintiffs' Property that Allendale

appropriated without compensation.

113.    The Sale Agreement was executed on March 24, 2022 – long after the NJDEP registered Well 17 as "Treatment Plant TP004020". Allendale's Interrogatory Response No. 22 confirms that Allendale knew the NJDEP had publicly classified the site as a treatment plant at the time of the sale.

114.    Accordingly, when Allendale executed the Sale Agreement on March 24, 2022, it knew: (a) it was selling a NJDEP-registered treatment plant; (b) that treatment plant was located on Plaintiffs' Property; (c) the governing easement did not authorize a treatment plant; (d) Allendale/Suez/Veolia had a pre-existing "plan" to construct a PFAS treatment plant on Plaintiff's Property – as stated by Allendale's then Council President in an email; and (e) there was never any intention on the part of Allendale to compensate Plaintiffs for the taking of the property rights necessary to operate a PFAS treatment plant.

115.    Allendale sold and warranted good title anyway – all the while collecting $17,207,000 in the process by virtue of Veolia's oversized payment based on obtaining free reign over Well 17.  This joint participation with Allendale in the seizure of Plaintiffs' Property is sufficient to characterize Veolia as a "state actor" for purposes of the Fourteenth Amendment.

116.    Indeed, this coordination continues to this day.   On March 14, 2025, counsel for Veolia wrote Judge Ostuni:  "The Borough of Allendale will be joined in this litigation through Veolia's answer, **and the Borough will confirm** that it originally drilled the well, installed the pumping facilities, and has maintained them for decades in compliance with regulations set forth by the New Jersey Department of Environmental Protection ("DEP") and the United States." Knowing in advance how Allendale would respond to a yet-to-be-filed purported **adverse pleading** is the height of improper coordination.  It is no surprise that on October 31, 2025

Allendale filed its own opposition to Plaintiffs' Motion for Summary Judgment as regards injunctive relief.  Indeed, discovery will disclose whether those and other court filings were written with the assistance and coordination of Veolia's legal counsel even though Veolia sued Allendale in that action.

117.    On June 3, 2026, at the Allendale Town Hall meeting conducted at the Community Center, Councilwoman Liz Homan provided an update regarding Veolia water issues and potential future water rate increases which would be contrary to the referendum. She also specifically referenced Well 17 as an issue requiring attention.

118.    During her remarks, Councilwoman Homan referenced that it was "unfortunate" that litigation had delayed the construction of a PFAS treatment facility at Well 17 due to a resident's opposition to the project. Former Allendale Mayor Liz White, who was present in the audience, also stated that it was "unfortunate" that the lawsuit had prevented the installation of treatment facilities by Well 17 and said that the result was that residents "were not receiving clean water."  Prospective council member Don McKenna then left a question out to linger regarding how residents could determine which homes were receiving the "dirty water" referenced during the discussion but no one on the council mentioned the two reports obtained by Allendale years earlier suggesting that Well 17 be shut down if excess contamination was discovered.

119.    The comments by Councilwoman Homan, former Mayor Liz White, and Mr. McKenna each reference the litigation involving the proposed PFAS treatment facility at Well 17 and connected the lawsuit to concerns regarding drinking water quality and treatment infrastructure within Allendale.  More to the point, Councilwoman Liz Homan told the audience that if "we can't build it there" because of the lawsuit they would "reconfigure the Cul de sac and

build it in front of your house." This threat by a sitting elected official directed at a homeowner for exercising her constitutional right to seek judicial relief constitutes an independent act of governmental coercion consistent with §1983. A municipality's response to a property owner's exercise of constitutional rights cannot be to threaten further unconstitutional occupation of that owner's neighborhood. This threat is also direct evidence that Allendale's conduct is the product of deliberate official policy, not inadvertence, and that the constitutional violation is ongoing. Ms. Homan obviously believed that threatening to place a large water treatment plant in the middle of a residential neighborhood would somehow help Veolia's cause.

120.   A year beforehand, on June 3, 2025, at a similar public town meeting former mayor Liz White snidely told Plaintiffs that "next time do your research before finding a house"; "don't buy a house with an easement"; and "your realtor should have told you about the easement". At that same June 3, 2025 meeting, Plaintiffs informed the Council regarding fears they had for their children. In response, former Allendale mayor Liz White chimed in as she would do a year later with snark advice to Plaintiffs: "Tell your kids to play somewhere else or go inside." Plaintiffs' concerns were publicly mocked by the former mayor solely to assist Veolia get its way.

121.   Based on the existing record, Veolia is also a functional state actor subject to § 1983. Veolia is a licensed public utility operating under a franchise granted and regulated by the State of New Jersey through the New Jersey Board of Public Utilities, providing an essential public service, namely the provision of potable drinking water to the residents of Allendale. The provision of potable drinking water is a function traditionally and exclusively associated with governmental authority. Veolia is subject to pervasive state regulation: its rates, service territory, capital expenditures, and infrastructure decisions all require approval by the Board of Public

Utilities, and its NJDEP-registered Treatment Plant (TP004020) at Plaintiffs' Property operates pursuant to state-issued permits and under active NJDEP oversight.

122.    Veolia acquired its purported rights in Plaintiffs' Property through a formal governmental process by way of a competitive public bidding procedure under N.J.S.A. 40:62-3, subject to public notice, municipal resolution, and public referendum.  Those rights were conveyed through the exercise of Allendale's governmental authority.

123.    Veolia never had any legal basis to be on Plaintiffs' Property other than what was derived from its functional governmental role.  Every source of authority Veolia has ever asserted over Plaintiffs' Property was created, granted, or transferred by virtue of a governmental act.  The easement was created by Allendale's governmental predecessors in 1966.  The right to operate a treatment plant at the Property was registered with the NJDEP by Allendale as a governmental function.  The assignment of that easement to Veolia was executed by a Mayor acting in his official governmental capacity.  Veolia's authority to occupy Plaintiffs' Property was then ratified by a public vote of Allendale's residents.  Veolia's ongoing operation on Plaintiffs' Property is subject to continuing NJDEP oversight and BPU rate regulation under state law and not to the ordinary commercial terms a private landowner or licensee would negotiate with a property owner.

124.    Veolia never approached Plaintiffs.  It never sought their consent for any activity conducted on the Property.  It never offered them consideration.  It simply stepped into a set of pre-existing governmental rights created entirely by state power, then exercised them as its own, and now cannot claims the protection of private status to escape the resulting constitutional consequences.  Again, Veolia is a private party that occupies Plaintiffs' Property solely by virtue of rights created, transferred, and regulated by governmental entities and never acted as a private

party but rather Allendale's constitutional successor and partner in the occupation of Plaintiffs' Property. The subsequent conduct between the Defendants referenced above confirms as much.

125. Veolia's liability as a state actor is independently established under the public function doctrine because at all relevant times and for all pertinent conduct it was a private entity exercising powers traditionally and exclusively reserved by the State. The ownership and operation of a municipal public water supply system is, in New Jersey, a sovereign governmental function. New Jersey law vests regulatory authority over public water systems in the NJDEP and authorizes municipalities to acquire, maintain, and sell public water systems on behalf of the public. In this case, Allendale exercised that sovereign authority to create the water system, acquire easements over private properties for its infrastructure, register treatment facilities with the NJDEP, and operate a system serving Borough residents for decades. Veolia stepped directly and entirely into these and other governmental functions previously undertaken by Allendale.

126. The Easement Assignment conveying Plaintiffs' Property was executed by Allendale's Mayor, a constitutional officer, and by Veolia's then Vice President, transferring "ALL Grantor's right, title and interest" in a governmental easement obtained through the exercise of state power. Veolia cannot hold the benefits of that governmental grant while escaping the constitutional constraints that attach to it. A private utility whose entire legal authority to occupy a citizen's property flows from the sovereign's act of transferring governmental easement rights exercises those rights as a state actor.

127. Allendale did not hire Veolia to provide water services on the Borough's behalf. It permanently and completely divested itself of Allendale's entire governmental water function, transferring every right, every easement, every permit, every registered treatment facility, and every piece of infrastructure to Veolia through a process that required, and received, the

approval of Allendale's voters by public referendum. After that transfer, Allendale retained no water authority whatsoever. It cannot operate a well, issue a permit, or enter an easement on its own water infrastructure. Veolia did not become Allendale's water vendor; it became Allendale's water authority.

128. When the residents of Allendale voted to transfer their municipal water system to Veolia, they were not approving a procurement but were voting to vest a sovereign governmental function to a private corporation. The constitutional obligations that Allendale owed to Plaintiffs as a property owner burdened by a **governmental easement** did not dissolve in that transfer. They traveled with it. Veolia holds Plaintiffs' Property on the same governmental terms on which Allendale held it, and is bound by the same constitutional constraints. What happens when government abdicates its duties to private enterprise is not always pleasant.

129. Prior to this suit being filed, Veolia workers would incredibly arrive in gas masks and use unknown chemical substances on the Property without ever telling Plaintiffs what they were doing and why they were doing it. Sometimes doing this in the middle of the night.

130. In addition to Veolia workers arriving in gas masks and spilling unknown chemicals, Plaintiffs and their three children have endured illegal parking; loud unexplained banging sounds coming from the well area; the removal of trees and natural landscaping in violation of the express rural-atmosphere covenant, tree removal without permits; electrical work and antenna installation without permits; fear of physical harm, and the threat of a 35x22 foot chemical treatment building in very close proximity to their home leading to severe emotional distress. These are just a few of the non-economic harms that Veolia's conduct and Defendants' unconstitutional taking has imposed on Plaintiffs.

131.     The below photograph shows one such masked Veolia worker handling hazardous chemicals and the used work gloves he casually leaves behind on the ground:



132.     As a direct and proximate result of Defendants' unconstitutional taking of Plaintiffs' property, Plaintiffs are entitled to the following relief:

(a) **Just compensation** representing the fair market value of all property rights physically taken by Defendants beyond the scope of the Easement Agreement, including the right to construct and maintain a permanent structure, operate a water treatment facility, use and store chemicals, install SCADA monitoring equipment and antenna, and destroy natural landscaping all measured from the date of each taking;

(b) **Severance damages** representing the diminution in value of the remainder of Plaintiffs' Property caused by the unauthorized occupation and industrial transformation of the easement area, including but not limited to the adverse effect on Plaintiffs' residential property values caused by the presence of an NJDEP-registered treatment plant immediately adjacent to their home;

(c) **Consequential and incidental damages**, including for the destruction of mature landscaping and the natural buffer covenanted in the Easement Agreement, the introduction and storage of hazardous chemicals in proximity to Plaintiffs' home and family, loss of use and enjoyment of the Property, interference with Plaintiffs' reasonable investment-backed expectations, the diminution damages associated with a property encumbered by existing and planned industrial water treatment facilities and documented contamination exceeding federal maximum contaminant levels yet as still open well, and emotional distress caused by such conduct;

(d) **Disgorgement** of an equitable share of the $17,207,000 in net consideration Allendale received in the 2022 asset sale up to the extent attributable to property rights in Plaintiffs' land that Allendale had never lawfully acquired and had no right to convey. This relief exists in part as an equitable remedy for Allendale's unjust enrichment, namely it being enriched by the full commercial value of property rights it misappropriated from Plaintiffs and had no right to convey, and independently as a remedy under 42 U.S.C. § 1983, which authorizes any appropriate relief, legal or equitable, to redress the deprivation of a constitutional right.

(e) **Reasonable attorneys' fees and costs** pursuant to 42 U.S.C. § 1988(b) should Plaintiffs prevail in their claim; and

(f) **Pre-judgment interest** from the date of the first compensable taking and post-judgment interest at the maximum rate permitted by law.

**COUNT II**
**(Breach of Contract)**

133.    Plaintiffs repeat and reallege each of the allegations contained in paragraph 1 through 132 of this Complaint with the same force and effect as if fully set forth herein.

134.    Plaintiffs were/are in contractual privity with Defendants by virtue of the Easement Agreement which runs with the land.

135.    Plaintiffs performed all of Plaintiffs' obligations under the Easement Agreement.

136.    Defendants violated the Easement Agreement by failing to perform obligations to Plaintiff, including complying with the restrictions found in the agreement.

137.    This breach was material in nature.

138.    As a result of this breach, Plaintiffs have sustained damages and will continue to sustain direct, consequential and incidental damages in an amount to be determined at trial.

**COUNT III**
**(Violation of the Covenant of Good Faith and Fair Dealing)**

139.    Plaintiffs repeat and reallege each of the allegations contained in paragraph 1 through 138 of this Complaint with the same force and effect as if fully set forth herein.

140.    Covenants of good faith and fair dealing arise when parties enter into contracts such as the Easement Agreement.

141.    At all relevant times, Plaintiffs acted in good faith and yet, Defendants failed to act in good faith when rendering performance under the Easement Agreement by recklessly and intentionally exceeding the scope of permitted use under the Easement Agreement.

142.    As a result of this breach, Plaintiffs have sustained damages and will continue to sustain direct, consequential and incidental damages in an amount to be determined at trial.

143.    Defendant's actions in this regard were reckless and malicious, justifying an award of punitive damages, attorneys' fees and cost.

**WHEREFORE**, Plaintiffs Kris Van Der Leeuw and Laura Van Der Leeuw demand judgment against Defendant Veolia New Jersey Water, Inc. and Defendant Borough of Allendale as follows:

A) Requiring that Defendants fund (i) an environmental assessment of the Property and any necessary remediation ensuring the safety of residents located near Well 17; (ii) the abatement of the ongoing noise emanating on the Property from Well 17; (iii) the removal of toxic chemicals on the Property as well as the replanting of trees sufficient to restore the rural character of the easement;

B) Ruling that Defendants' physical construction of a permanent shed and installation of water treatment facilities, chemical storage systems, SCADA monitoring equipment, antenna, and all other improvements on the Property are in excess of the Easement Agreement and constitutes an unconstitutional taking of Plaintiffs' property without just compensation, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Article I, Paragraph 20 of the New Jersey Constitution;

C) Ruling that the sale and transfer to Veolia of purported easement rights in Plaintiffs' Property beyond the scope of the Easement Agreement for valuable commercial consideration and without paying just compensation constitutes an unconstitutional taking, an unjust enrichment at Plaintiffs' expense, and a compensable violation under 42 U.S.C. § 1983;

D) Awarding just compensation in an amount to be determined at trial, representing, in part, the fair market value of all property rights taken, measured from the date of each taking;

E) Awarding consequential damages in amounts to be proven at trial, including diminution damages attributable to the NJDEP's registration of the site as a treatment plant and documented contamination exceeding applicable federal maximum

contaminant levels while keeping Well 17 open, and Defendants' other conduct outlined in this Complaint, and damages for the severe emotional distress caused by Defendants that has required professional assistance to mitigate;

F) Awarding disgorgement of Allendale's profit from the November 30, 2022 asset sale, including an equitable share of the $17,207,000 (depending on the final survey cost and escrow release) in net proceeds Allendale received, in an amount to be proven at trial;

G) Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

H) Awarding pre-judgment and post-judgment interest;

I) Awarding any other applicable actual, consequential, incidental, nominal, punitive and expectation damages available to Plaintiffs; and

J) Granting such other and further relief as this Court deems just and equitable.

Pursuant to Fed. R. Civ. P. 38 (b), Plaintiffs hereby demand a trial by jury on all triable issues.

By:    /s Paul E. Paray
          Paul E. Paray
       Paul E. Paray, Esq.
       65 Harristown Road, Suite 208
       Glen Rock, NJ 07452
       201-281-5134
       paulp@paraylaw.com
       Attorney for Plaintiffs Kris and Laura Van Der Leeuw

DATED:  June 9, 2026

# EXHIBIT "A"

**STRASSER & ASSOCIATES, P.C.**
WILLIAM I. STRASSER, ESQ.
Attorney Id No.: 014921974
7 East Ridgewood Avenue
Paramus, New Jersey 07652
PHONE: 201.445.9001
FAX: 201.445.1188
E-MAIL: wis@strasserlaw.com
*Attorneys for Plaintiffs Kris and Laura Van Der Leeuw*

**FILED**

**MAR 2 6 2025**

**NICHOLAS OSTUNI, J.S.C.**

| | |
|---|---|
| **KRIS VAN DER LEEUW and LAURA VAN DER LEEUW**<br><br>Plaintiffs,<br><br>v.<br><br>**VEOLIA WATER NEW JERSEY, INC.**<br><br>Defendant. | **SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION GENERAL EQUITY PART BERGEN COUNTY**<br><br>Docket No.: **C-23-25**<br><br>Civil Action<br><br>**ORDER** |

THIS MATTER, being brought before the Court by Strasser and Associates, P.C. (William I. Strasser, Esq. appearing), attorneys for Plaintiffs Kris Van Der Leeuw and Laura Van Der Leeuw (hereinafter collectively the "Plaintiffs"), seeking relief by way of an Order to Show Cause against Veolia Water New Jersey, Inc. (hereinafter "Veolia" or "Defendant") and the Court having read and considered the papers filed on behalf of the respective parties and the Court having heard and considered the arguments of counsel on March 17, 2023, and for good cause shown:

IT IS on this 26th day of March 2025, **ORDERED** that:

1. The Defendant, Veolia Water New Jersey, Inc., is hereby enjoined, prohibited and otherwise barred and restrained from expanding the existing use, conducting any additional activity and/or making any modifications to the shed and facilities on the Plaintiffs' property located at 7 Ethel Avenue in the Borough of Allendale, County of Bergen and State of New Jersey (hereinafter the "Property") until further order of this Court. Said

1

restrained activity and prohibited acts includes but is not limited to the following (hereinafter the "Prohibited Acts"):

a) Installation of any electrical, plumbing and/or water treatment upgrades at the Property of any type, which include but are not limited to showers, sinks, pumps, antennae, electrical panels, cameras, lighting, or other such improvements at the Property. Subject to further order of this Court, same does not prohibit the routine maintenance of the equipment currently operating at the Property as of March 17, 2025. Any activity at the Plaintiff's Property in the Easement Area, outside routine *including the replacement in-kind of any equipment in the event* maintenance, must be on written notice to the Plaintiff; *said equipment fails*

b) Subject to further order of this Court, storage or utilization of any chemicals at the Property in excess of the amounts currently being stored and utilized at the Property, installation of any water treatment apparatus or treatment facilities at the Property, or storage of any additional chemicals not being stored at the Property as of March 17, 2025.

c) Removal of any trees or natural buffers at the Property, except in the case of a situation that poses imminent danger to life or property, then and in that event the Defendant must provide Plaintiff with written notice and an opportunity to respond prior to any such removal, provided that same does not violate the strict language of the Easement Agreement; *Such response by the plaintiffs shall be provided within 24 hours;*

d) Installation of any mechanical or structural improvements at the Property.

2. Further, the Defendant is hereby enjoined, prohibited or otherwise barred from applying to any local, state or federal department, agency, board, or governmental body in an attempt to achieve approval of the foregoing Prohibited Acts during the pendency of this litigation. Said governmental bodies include but are not limited to the Allendale Land Use Board,

2

Allendale Construction Office, New Jersey Board of Public Utilities ("BPU"), New Jersey

Department of Environmental Protection ("NJDEP"), ~~United States Environmental~~

~~Protection Agency ("EPA")~~ or any other such *New Jersey State* governmental regulatory agency or board;

and

**IT IS FURTHER ORDERED**, that this matter is scheduled for a continued hearing on

April 22, 2025. In connection with same, the Defendant is directed to submit further information

to the Court regarding the water system, its operation and the alternative site for the proposed water

treatment facility on or before April 4, 2025.  Plaintiffs shall have the opportunity to submit a

response to same on or before April 18, 2025; and

**IT IS FURTHER ORDERED** that a discovery schedule shall be set at the April 22, 2025

conference; and

**IT IS FURTHER ORDERED** that a copy of this Order is deemed to be served upon all

parties by the filing of same on eCourts.



HONORABLE NICHOLAS OSTUNI, J.S.C.

\* This Court has reviewed defendant's objections to this form of order and has made appropriate modifications based upon the intent of this Court's Order. It shall be noted that defendant's concerns that paragraph 2 infringes upon defendant's Constitutional and due process rights is misguided. Status quo shall remain during this litigation absent leave of this Court on proper motion. This Court has no intention of exceeding its jurisdiction.

3

# EXHIBIT "B"

GLS 2377
DB 5078, PG 85

Well #17

37,070
ED

THIS INDENTURE, made this 10th day of   May
1966, between

WALTER TEMPERLYN and ETHEL TEMPERLYN, his wife,
of the Borough of Allendale, in the County of Bergen and
State of New Jersey, hereinafter referred to as the Grantors,
and

THE BOROUGH OF ALLENDALE, a municipal corpora-
tion in the County of Bergen and State of New Jersey,
hereinafter referred to as the Grantee;

WITNESSETH THAT:

In consideration of the sum of One ($1.00)
Dollar, lawful money of the United States, and other good
and valuable considerations, the Grantors have given, granted
and conveyed and by these  presents do give, grant and convey
unto the Grantee, its successors and assigns, the following
easements:

Easement No. 1:  An easement in premises of
the Grantors situate in the Borough of Allendale, in the
County of Bergen and State of New Jersey, the said easement
area being more particularly described as follows:

Starting at a point in the easterly line of
Beatrice Street at the intersection of the same with the
northwesterly corner of Lot 9 in Block 44 as shown upon the
assessment map of the Borough of Allendale, and running
along the northerly line of said lot and along the northerly
line of Lot 5B in Block 44 as shown upon said map, a distance
of two hundred forty (240) feet to the point and place of
beginning and running thence (1) still along the northerly
line of said Lot 5B in Block 44, South 53 degrees 45 minutes
East forty (40) feet to the easterly line of said Lot 5B in
Block 44; thence (2) along the easterly line of said Lot 5B
in Block 44, South 28 degrees 15 minutes West forty (40) feet;
thence (3) parallel with the first course North 53 degrees 45
minutes West forty (40) feet; thence (4) parallel with the



BOOK 5078 PAGE 85

second course North 28 degrees 15 minutes East forty (40) feet to the point or place of beginning; which easement shall be for the purpose of drilling and maintaining a water well in, upon and under the premises herein described, together with the necessary pumping facilities and pipes.

The Grantee, for itself, its successors and assigns, covenants and agrees to and with the Grantors that it will at all times endeavor to maintain the present rural atmosphere of the site and remove only such trees as may be reasonably necessary in connection with its use of the premises and shall keep the premises in a neat, level and clean condition and properly landscaped with evergreen trees.

Easement No. 2: An easement twenty-five (25) feet in width over and across premises of the Grantors situate in the Borough of Allendale, in the County of Bergen and State of New Jersey, which said easement is more particularly described as follows:

BEGINNING at the northwesterly corner of Lot 9 in Block 44 as shown upon the assessment map of the Borough of Allendale and in the easterly line of Beatrice Street and running from thence (1) across Beatrice Street, North 53 degrees 45 minutes West fifty and forty-nine hundredths (50.49) feet; thence (2) North 28 degrees 15 minutes East thirty-five and thirty-four hundredths (35.34) feet; thence (3) South 53 degrees 45 minutes East and parallel with the northerly line of Lots 9 and 5B in Block 44 as shown on the assessment map of the Borough of Allendale three hundred thirty and forty-nine hundredths (330.49) feet to the projection northerly of the easterly line of Lot 5B in Block 44 as shown on the assessment map of the Borough of Allendale; thence (4) along such projection South 28 degrees 15 minutes West thirty-five and thirty-four hundredths (35.34) feet to the northerly line

-2- BOOK 5078 PAGE 86

of Lot 5B in Block 44 as aforesaid; thence (5) along the northerly line of said Lot, North 53 degrees 45 minutes West forty (40) feet; thence (6) North 28 degrees 15 minutes East ten and ten hundredths (10.10) feet; thence (7) parallel with the third course and distant southerly twenty-five (25) feet therefrom as measured at right angles North 53 degrees 45 minutes West a distance of two hundred (240) feet; thence (8) South 28 degrees 15 minutes West ten and ten hundredths (10.10) feet to the point or place of beginning; which easement shall be for the purpose of laying and maintaining therein a water main from Beatrice Street to the premises described as Easement No. 1, and for the purpose of access to the lands affected by Easement No. 1 from Beatrice Street.

The Grantee, for itself, its successors and assigns, covenants and agrees to and with the Grantors that it will only enter upon said premises for the purpose of laying and maintaining the aforesaid water main and for the purpose of constructing a suitable driveway from Beatrice Street to the well site and for the maintenance of the same and for no other purposes whatsoever and it will at all times keep the ground upon said right of way in a satisfactory level and clean condition; that it will remove any and all large stones from the premises and that it will immediately following any excavation replace the soil and restore the premises so they will be in substantially the same condition in which they were prior to the excavation. The driveway upon the easement shall be maintained in a good condition.

TO HAVE AND TO HOLD both of said easements for the purposes mentioned above unto the Borough of Allendale, to the only proper use and benefit of said

-3-

BOOK 5078 PAGE 87

Borough, its successors and assigns, forever.

IN WITNESS WHEREOF, the Grantors have hereunto set their hands and seals the day and year first above written.

Signed, sealed and delivered

in the presence of

_Walter W. Weber, Jr._

_Walter Temperlyn_   L.S.
Walter Temperlyn

_Ethel Temperlyn_   L.S.
Ethel Temperlyn

STATE OF NEW JERSEY )
                    : SS.:
COUNTY OF BERGEN    )

BE IT REMEMBERED, That on this 10th day of    May    , Nineteen hundred and sixty-six, before me, the subscriber, an Attorney-at-Law of New Jersey personally appeared WALTER TEMPERLYN and ETHEL TEMPERLYN, his wife, who, I am satisfied, are the Grantors mentioned in the within instrument, to whom I first made known the contents thereof, and thereupon they acknowledged that they signed, sealed and delivered the same as their voluntary act and deed, for the uses and purposes therein expressed.

_Walter W. Weber, Jr._
Walter W. Weber, Jr.
Attorney-at-Law of New Jersey

-4-

BOOK 5078 PAGE 88

E A S E M E N T
-Charge-------------------------------

WALTER TEMPERLYN and wife

RECORDING FEE $ 9 25

9.25         PAID
BOROUGH OF ALLENDALE

---------------------------------------

Dated:          May 10      , 1966
---------------------------------------

35,540 AUG 11 67    DEED

BOOK 5078 PAGE 89

WINNE AND DOOLEY
25 EAST SALEM ST.
HACKENSACK N.J. 07601

County Clerk

RECEIVED
1967 AUG 11 AM 10: 20

BERGEN COUNTY CLERK

WEBER, MUTH & WEBER
COUNSELLORS-AT-LAW
1 CHERRY LANE
RAMSEY, NEW JERSEY

GLS 2377
DB 5078, PG 90

37,070
ED

THIS INDENTURE, made this 10th day of May,
1966, between

WALTER TEMPERLYN and ETHEL TEMPERLYN, his wife,
of the Borough of Allendale, in the County of Bergen and
State of New Jersey, hereinafter referred to as the Grantors,
and

THE BOROUGH OF ALLENDALE, a municipal corpora-
tion in the County of Bergen and State of New Jersey,
hereinafter referred to as the Grantee:

WITNESSETH THAT:

In consideration of the sum of One ($1.00)
Dollar, lawful money of the United States, and other good
and valuable considerations, the Grantors have given, granted
and conveyed and by these presents do give, grant and convey
unto the Grantee, its successors and assigns, an easement in
premises of the Grantors situate, lying and being in the Bor-
ough of Allendale, County of Bergen and State of New Jersey,
said easement area being more particularly described as
follows:

BEGINNING at the northeasterly corner of Lot 5B
in Block 44, as shown on the tax assessment map of the Borough
of Allendale, and running thence (1) South 53 degrees 45 min-
utes East twenty and twenty hundredths (20.20) feet; thence (2)
South 28 degrees 15 minutes West ninety-six and fifty-eight
hundredths (96.58) feet; thence (3) through a right of way
known as Meeker Avenue, South 59 degrees 38 minutes East ninety
(90) feet; thence (4) South 30 degrees 22 minutes West ten (10)
feet; thence (5) at a distance of ten (10) feet southerly from
the northerly line of an existing right of way called Meeker
Avenue, parallel with and ten (10) feet southerly from course
(3) North 59 degrees 38 minutes West ninety-nine and sixty-four

BOOK 5078 PAGE 90

hundredths (99.64) feet; thence (6) parallel with and ten (10) feet westerly from course (2), North 28 degrees 15 minutes East sixty-seven and sixty-one hundredths (67.61) feet; thence (7) parallel with and forty (40) feet southerly from course (1), North 53 degrees 45 minutes West ten and ten hundredths (10.10) feet to the easterly line of said Lot 5B in Block 44; thence (8) along the easterly line of said lot North 28 degrees 15 minutes East forty (40) feet to the point and place of beginning, which easement shall be for the purpose of laying and maintaining therein a water main from the well site located upon said Lot 5B in Block 44 to Meeker Avenue.

The Grantee, for itself, its successors and assigns, covenants and agrees to and with the Grantors that it will enter upon said premises only for the purpose of laying and maintaining the aforesaid water main; that upon completion of any work it will remove any and all large stones and all other debris from the premises, replace the soil and restore the premises to substantially the same condition in which they were prior to the excavation.

TO HAVE AND TO HOLD said easement for the purposes mentioned above unto the Borough of Allendale to the only proper use and benefit of said Borough, its successors and assigns, forever.

IN WITNESS WHEREOF, the Grantors have hereunto set their hands and seals the day and year first above written.

Signed, sealed and delivered
    in the presence of

_Walter Temperlyn_ L.S.
Walter Temperlyn

_Ethel Temperlyn_ L.S.
Ethel Temperlyn

Walter W. Weber, Jr.

BOOK 5078 PAGE 91

STATE OF NEW JERSEY )
                    : SS.:
COUNTY OF BERGEN    )

                BE IT REMEMBERED, That on this 10th day of    May      , 1966, before me, the subscriber, an Attorney-at-Law of New Jersey    personally appeared WALTER TEMPERLYN and ETHEL TEMPERLYN, his wife, who, I am satisfied, are the Grantors mentioned in the within instrument, to whom I first made known the contents thereof, and thereupon they acknowledged that they signed, sealed and delivered the same as their voluntary act and deed, for the uses and purposes therein expressed.

                                    Walter W. Weber, Jr.
                                      Attorney-at-Law of New Jersey

BOOK 5078 PAGE 92

Case 2:26-cv-06852-JXN-CF    Document 1    Filed 06/09/26    Page 62 of 66 PageID: 62

A G R E E M E N T
-----------------------------------
Charge *Easement*

WALTER TEMPERLYN and wife

RECORDING FEE $ *8.25*
and
8,25
PAID

THE BOARD OF PUBLIC WORKS
OF THE BOROUGH OF ALLENDALE

-----------------------------------
Dated:        May 10        , 1966
-----------------------------------

35,541 AUG 11 67    DEED

BOOK 5078 PAGE 93

RECEIVED
1967 AUG 11  AM 10: 21
*Alexander Allen*
BERGEN COUNTY CLERK

Record and Return to:

WINNE AND DOOLEY
25 East Salem St.
Hackensack, N. J. 07601

*Alexander Allen*
County Clerk

WEBER X MUTH X & X WEBER
XCOUNSELLORS XAT XLAW X
XIX RUSBURY XLANE X
XRAMSEY X X NEW X JERSEY



# EXHIBIT "C"

**Borough of**

# Allendale
### NEW JERSEY

## A MESSAGE FROM THE MAYOR & COUNCIL

The Mayor and Council of the Borough of Allendale want to provide accurate information, a historical overview and updates concerning Well 17 and the Borough's ongoing efforts to ensure safe drinking water for all residents.

### HISTORY OF WELL 17 (NJ WATER WATCH TP004020)

Well 17, located at the end of Ethel Ave in the northern area of Allendale, was commissioned in 1966. This location was selected based on a number of key factors, including such hydrogeological assessments as depth of water table, aquifer depth and drawdown rate. Well 17 provides approximately 20% of the water used by Allendale residents annually. The Borough has been treating the water at this location for decades and there is currently a structure housing the treatment on this site. There are two historical easements filed when the well was commissioned on an Ethel Ave property; one for Well 17 and one for the pipes that are utilized to distribute water from the well. Easements are disclosed at the time of a property purchase. The site has been listed in NJDEP's Water Watch as a Well (WL004006) and a Treatment Plant (TP004020) for more than twenty years.

### TREATMENT FOR DRINKABLE WATER

To ensure potable (drinkable) water, water must be treated as required by Federal and State regulations and routinely tested to make sure standards are met or exceeded.

- Water from Well 17, as with all Allendale wells, has been treated for over 30 years with sodium hypochlorite (concentrated household bleach) to kill potential pathogens.

- *The photograph circulating on social media of a worker in a mask depicts a routine delivery of sodium hypochlorite as indicated by its identification number on Veolia's truck and on Well 17. OSHA (Occupational Safety & Health Administration) suggests workers in close proximity to sodium hypochlorite (concentrated bleach) for an aggregate time over the course of their shift wear proper safety equipment, including masks and gloves.*

- To address the state lead and copper requirements, zinc orthophosphate is also added for corrosion control. This required, non-toxic solution creates a protective film on the interior of pipes, reducing metal leaching into the water. Veolia has been working to identify and replace old lead lines throughout Allendale to comply with this NJ Lead and Copper mandate at their expense.

    TO DATE, THERE HAS BEEN **NO CHANGE** IN THE TREATMENT OF THE WATER FROM WELL 17.

### WHAT HAS CHANGED?

New PFAS Treatment regulations: per- and polyfluoroalkyl substances (PFAS) are a group of man-made chemicals used in various products for their grease, stain, and water-resistant properties. They are known as "forever chemicals" due to their persistence in the environment and human body. PFAS chemicals have been linked to numerous health issues, including increased risk of certain cancers.

Federal and State regulations now require the reduction of PFAS contaminants (PFOA, PFOS and others) to less than 4 parts per trillion (PPT) in drinking water. Treatment systems eliminate PFAS compounds by filtering them out. The systems are equivalent to a giant Brita Filter. The system size and large vessels are necessary and driven by the significant volume of water to be treated and the extended contact time for the water to filter out the PFAS compounds.

This treatment is NOT currently in place.

**PAGE 1**

*Continued on page 2*

# Allendale
## NEW JERSEY

**A MESSAGE FROM THE MAYOR & COUNCIL**

*Continued from page 1*

## SALE OF THE WATER SYSTEM

The sale of the water system continues to ensure ongoing compliance to meet today's health, safety and environmental regulations, something Allendale was no longer equipped to meet. Faced with regulatory violations, aging infrastructure and lack of technical expertise, it was apparent that a long-term solution needed to be explored. To engage the community, a series of educational presentations were held to inform residents about the challenges and options. Ultimately, Allendale voters overwhelmingly approved the sale of the water system through a public referendum. The successful bidder was SUEZ, who managed the system since 2013. SUEZ was later acquired by Veolia.

Ensuring the delivery of safe, clean drinking water has always been—and remains—our top priority. As new contaminants emerge and regulatory requirements grow increasingly complex, it has become even more evident that the decision to sell to Veolia was the right one. Retaining ownership of the system would have placed an unsustainable financial burden on our small municipality, potentially requiring tens of millions of dollars just to meet evolving standards, excluding the costs of water main repairs and daily operations.

## VEOLIA, EASEMENTS & THE BOROUGH

With the sale of our water system, the easements related to operations of the system transferred to Veolia. Veolia has the legal responsibility to treat new and emerging contaminants. Residents living near Well 17 have expressed opposition to enlarging the current treatment structure to house the mandated PFAS filtration treatment. Veolia believes this additional treatment is allowable on the easements; the homeowners with the property easements do not. To date, the Borough has not received any building plans and therefore no building codes were violated.

There is now a lawsuit and unfortunately the Borough has been brought into it. The question of overburdening the easement by adding the PFAS filters is being decided in court. Veolia has been instructed by the judge NOT to pursue the installation of PFAS treatment at Well 17 at this time.

The most recent test at Well 17 (TP004020) shows an 8.24 ppt result for PFOA, more than double the EPA maximum contaminant level.

Veolia continues to maintain the well with no changes, only sodium hypochlorite and zinc orthophosphate as explained above. This has been confirmed by the Borough engineer.

Borough elected officials have met with Veolia executives on several occasions, including just last week. The Mayor and Council members have urged them to look for alternate locations and have even provided information regarding Borough-owned sites to explore. Due to the optimal location of Well 17, exploring alternate sites has been a challenge.

The Mayor and Council fully understand the concerns of the residents who live in the area of Well 17 and that a larger structure is not desired. This is a complex situation in which Veolia is responsible for providing clean drinking water to all Allendale residents but has now been ordered by the court to stop the planning process to filter PFAS at this site, which provides 20% of the water to our residents.

The Mayor and Council truly hope there is a mutually agreeable solution and reaffirm our commitment to advocating for the wellbeing of all residents.

Our next TOWN HALL is scheduled for June 3rd at 7:00pm at the community center.

*The Allendale Mayor & Council*

**PAGE 2**